**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| DANIEL BOZIN, individually and on behalf of all others similarly situated, *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>DELOITTE CONSULTING LLP<br><br>Defendant. | Case No.: 1:20-CV-01191-PAG<br><br>Judge Patricia A. Gaughan<br><br>Magistrate Judge Thomas M. Parker |

**PLAINTIFFS' EMERGENCY MOTION PURSUANT TO FED. R. CIV. P. 65 FOR A TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION**

NOW COME Plaintiffs DANIEL BOZIN ("Bozin"), TIMOTHY SMITH ("Smith"), ALEXANDRIA POLICHENA ("Polichena"), BERNADETTE NOLEN ("Nolen"), and NICOLE HORNBECK ("Hornbeck") (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through counsel, and bring their *Emergency Motion Pursuant to Fed. R. Civ. P. 65 for a Temporary Restraining Order and/or Preliminary Injunction* ("Motion"). Plaintiffs' counsel have provided notice of this Motion to Defendant.[1] In support of this Motion, Plaintiffs state as follows:

**I.   FACTUAL BASIS FOR THE MOTION.**

   **A.   The Data Breach.**

Plaintiffs brought this action, for themselves and on behalf of a Class[2], against Defendant

---

[1] Plaintiffs originally filed a motion for a temporary restraining order and/or preliminary injunction in state court, but Defendant removed the case to this Court before it could be heard on the merits.

[2] Plaintiffs seek certify of a Class defined as follows: "All individuals who applied for Pandemic Unemployment Assistance, including with the Colorado Department of Labor and Employment, Illinois Department of Employment Security, and Ohio Department of Job and Family Services,

DELOITTE CONSULTING LLP ("Deloitte" or "Defendant") for its actions and inactions that resulted in a data breach affecting applicants to the Pandemic Unemployment Assistance ("PUA") program in Ohio and other states. At one of the worst times in the lives of Plaintiffs and Class members, when they find themselves unemployed in the midst of a pandemic and resulting recession, Deloitte was brought in as an expert consultant by certain states, including Colorado, Illinois, and Ohio, to facilitate the secure and efficient processing of Plaintiffs' and Class members' claims for PUA. Compl. ¶ 8. However, Deloitte negligently and recklessly made Plaintiffs' and Class members' path to recovery significantly harder by putting their identity and credit standing at risk. *Id.* Deloitte has exposed and failed to protect Plaintiffs' and other PUA applicants' personal and financial information, including their names, Social Security numbers, and street addresses, and potentially other personal and financial information, as well as private information that applicants were required to provide on behalf of members of their families.

On May 20, 2020, Plaintiffs each received an email with the same Notice attached thereto. *See* Compl. ¶¶ 10-15. The Notice acknowledges that highly sensitive personal information was subject to unauthorized access by numerous third parties (the "Data Breach"). *See* Exhibit 1 to the Complaint (the "Notice"). The Notice stated:

> Dear PUA Applicant:
>
> Deloitte Consulting is currently under contract with the Ohio Department of Job and Family Services (ODJFS) to assist the state of Ohio in administering the Pandemic Unemployment Assistance (PUA) program. Deloitte discovered on May 15, 2020 that your name, Social Security number, and street address pertaining to your application for and receipt of

---

and whose personal information and/or financial information was exposed in the Data Breach." *See* Amended Class Action Complaint ("Complaint" or "Compl."), attached hereto as **Exhibit A**, ¶ 85.

unemployment compensation benefits inadvertently had the capability to be viewed by other unemployment claimants. Thereafter, Deloitte immediately began an investigation and upon discovering the exposure, Deloitte immediately took steps to stop further access to and exposure of your personal information.

At this time, there is no evidence or indication to believe that your personal information was improperly used; therefore, our actions, as well as the actions you may want to consider, are preventative.

As a precaution, you may want to monitor your credit by obtaining a copy of your credit report from one of the three national credit bureaus. Federal law entitles every individual to one free credit report per year from each of the three main bureaus.

You may also have a fraud alert placed on your consumer credit file by contacting one of the national credit bureaus. Once one credit bureau places a fraud alert on your credit file, it notifies the other two bureaus. Fraud alerts are typically in effect for 90 days but can be renewed. The credit bureaus may be contacted at:

Equifax: (800) 525-6285 (http://www.equifax.com)
Experian: (888) 397-3742 (http://www.experian.com)
TransUnion: (800) 680-7289 (http://www.tuc.com)

Additionally, Ohio law allows you to place a security freeze on your credit report by contacting one of the bureaus listed above. Should you wish to open a new line of credit while your report is frozen, you may temporarily lift this security freeze by telephone or online by providing a security code. Credit reporting agencies may charge a fee of no more than $5 for each freeze and unfreeze of your report.

If you wish to receive free Experian IdentityWorks identity protection services for the next 12 months, you will receive a follow-up email with enrollment details that will be sent to you via Deloitte or directly from Experian within 3-5 days.

Finally, to find out more about protecting your personal information, visit the Ohio Attorney General's Identity Theft protection page

> (http://www.ohioattorneygeneral.gov/IdentityTheft) and/or the Federal
> Trade Commission's identity theft assistance page
> (https://www.consumer.ftc.gov/features/feature-0014-identitytheft).
> We apologize for any concerns or inconvenience as a result of this
> unauthorized incident. Please be assured that we take very seriously our
> responsibility to safeguard the personal information you entrust to our
> care, and deeply regret that this incident occurred.
>
> If you have questions or concerns that remain unaddressed after reviewing
> this information, please email:
> DeloitteIdentityhelp@jfs.ohio.gov.

*See* Compl. at Exhibit 1 at pp. 1-2.

Upon information and belief, Deloitte failed to implement reasonable industry standards necessary to prevent a data breach, including the FTC's guidelines, resulting in the Data Breach. Compl. ¶ 21. Likewise, Deloitte failed to create, maintain, and/or comply with a written cybersecurity program that incorporated physical, technical, and administrative safeguards for the protection of personal and financial information and reasonably conformed to an industry recognized cybersecurity framework, resulting in the Data Breach. *Id.* ¶ 22. Because of its failure to create, maintain, and/or comply with a necessary cybersecurity program, Deloitte was unable to ensure the protection of information security and confidentiality, protect against obvious and readily foreseeable threats to information security and confidentiality or the unauthorized access of the Plaintiffs' and Class members' personal and financial information, resulting in the Data Breach. *Id.* ¶ 23.

It has been reported that the personal and financial information of PUA applicants was viewable online as recently as May 24, 2020, which is nine days after Deloitte reported that it discovered the Data Breach and "immediately took steps to stop further access to and exposure of

your personal information." *See* Declaration of Brian Flick in Support of Plaintiffs' Emergency Motion Pursuant to Fed. R. Civ. P. 65 for a Temporary Restraining Order and/or Preliminary Injunction, attached hereto as **Exhibit B**.

### B. Damages from Data Breaches.

The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[3] The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[4]

Identity thieves use stolen personal information such as SSNs for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud. Compl. ¶ 26. Identity thieves can also use SSNs to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and SSN to obtain government benefits; or file a fraudulent tax return using the victim's information. *Id.* ¶ 27. In addition, identity thieves

---

[3] Compl. ¶ 24, citing "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," pg. 2, by U.S. Government Accountability Office, June 2007, at: https://www.gao.gov/new.items/d07737.pdf (last visited May 20, 2020) ("GAO Report").

[4] Compl. ¶ 22, citing https://www.identitytheft.gov/Steps (last visited May 20, 2020).

may obtain a job using the victim's SSN, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name. *Id.* A study by the Identity Theft Resource Center show the multitude of harms caused by fraudulent use of personal and financial information:



Compl. ¶ 28, citing "Credit Card and ID Theft Statistics" by Jason Steele, 10/24/17, at:

https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php (last visited May 20, 2020).

Personal and financial information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years. Compl. ¶ 30. Thus, there is a strong probability that entire batches of stolen information have been dumped on the black market, and are yet to be dumped on the black

6

market, meaning Plaintiffs and Class members are at an increased risk of fraud and identity theft for many years into the future. *Id.* ¶ 31.

Data breaches are preventable.[5] As Lucy Thompson wrote in the DATA BREACH AND ENCRYPTION HANDBOOK, "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[6] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[7] "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures. . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a *data breach never occurs*."[8]

### C. As a Result of the Data Breach, Plaintiffs' and Class Members' Personal and Financial Information has been Compromised and Identity Theft has Occurred.

As a result of the Data Breach, Plaintiffs' and Class members' personal information, including their names, Social Security numbers, and street addresses, was compromised and exposed to unauthorized third parties. *See* Notice. Plaintiffs and the Class members have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft. *See* Compl. ¶ 80. In addition to fraudulent charges, loss of use of and access to their account funds and costs associated with inability to obtain money from their accounts, and damage to their

---

[5] Compl. ¶ 32, citing Lucy L. Thomson, "Despite the Alarming Trends, Data Breaches Are Preventable," *in* DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012).
[6] Compl. ¶ 32.
[7] *Id.*
[8] *Id.*

7

credit, many victims suffer ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach. *Id.* ¶ 81.

Further, despite the Notice saying that there is no indication that the personal information was improperly used, the personal information has *already* been used for identity theft. *See, e.g.,* Compl. ¶¶ 57-69.

### 1. Plaintiff Bernadette Nolen.

Nolen filed an application for PUA. *See* Declaration of Bernadette Nolen in Support of Plaintiffs' Emergency Motion for a Temporary Restraining Order ("Nolen Declaration"), attached hereto as **Exhibit C**, ¶ 2. She received the Notice of the Data Breach on or about May 20, 2020. *Id.* ¶ 3. On May 22, 2020, Nolen received PUA funds and they were directly deposited into her Netspend account, where she had requested the money be deposited. *Id.* ¶ 4. On May 23, 2020, Nolen received a text alert from Netspend stating that her card was reported stolen. *Id.* ¶ 5. She had her card with her at the time and had not reported it stolen. *Id.* ¶ 6.

Nolen immediately called Netspend and the representative stated that her account was locked and her card had been canceled. *Id.* ¶ 7. She was told that a new card would be sent to her in one week, and she would be without access to much needed funds in the meantime. *Id.* ¶ 7. A few hours later, Nolen received an e-mail from Netspend notifying her of a transfer of a substantial amount of money from her supposedly locked account to another account. *Id.* ¶ 8. Nolen had only one authorized account at the time—the account the money was transferred from—and she did not authorize the transfer reported in the email and did not own the account into which the money was being transferred. *Id.*

Nolen immediately called Netspend to dispute the transfer, and she spent approximately an hour and a half on the phone with a Netspend representative attempting to understand what occurred, explain her predicament, and rectify the situation. *Id.* ¶ 9. During this phone call, she was told Netspend had three accounts in her name. *Id.* The dispute is currently pending an internal investigation that could take months to resolve, according to Netspend. *Id.*

In addition, Nolen was notified that a substantial sum of money was wired by Western Union from her authorized Netspend account. *Id.* ¶ 10. She immediately called a Western Union representative but was unable to get very far. *Id.* The representative required a reference number to proceed that Nolen did not have. *Id.* Nolen disputed the charge, and the dispute is currently pending Western Union's investigation. *Id.*

On May 24, 2020, Nolen again spoke with a Netspend representative and she was informed that an unauthorized person was attempting to order new cards associated with her Netspend account. *Id.* ¶ 11. Because of this, on May 25, 2020, Nolen replaced the Netspend account with an account associated with her Money Network card to receive further direct deposits from PUA. On May 31, 2020, Nolen received a notification from Money Network via email that the newly-associated account was being locked because of four or more unauthorized failed attempts to log in to the account. *Id.*; *see also* Nolen Declaration at Exhibit 1.

In addition, Nolen was notified that her phone account was switched from her Boostmobile account to Metro using her personally identifiable information. *Id.* ¶ 13. Nolen did not authorize the switch. *Id.* She now has a new phone, and the phone is not in her name for her protection. *Id.*

Nolen spent time and effort to file a police report relating to these events for her protection and to secure her information going forward. *Id.* ¶ 14. While the significant issues with her funds

9

are being disputed, she is deprived of urgently needed money to provide for her children's basic needs, including healthcare, as well as her own. *Id.*

The issues that Plaintiff Nolen has experienced demonstrate that the "steps to stop further access to and exposure of [PUA applicants'] personal information" allegedly taken by Deloitte to address the Data Breach have not been effective. There is no way the identity thieves could have known that Nolen switched her PUA account from Netspend to Money Network without having *current* access to the PUA database, as she made the change *after* Deloitte's purported steps to stop further access to the database.

Thus, Plaintiffs' and Class members' personal and financial information continues to be exposed to unauthorized persons who continue to misuse it for illicit identity theft purposes, necessitating this Motion.

### 2. Plaintiff Nicole Hornbeck.

On May 12, 2020, Hornbeck filed an application for PUA. *See* Declaration of Plaintiff Nicole Hornbeck in Support of Plaintiffs' Emergency Motion Pursuant to Fed. R. Civ. P. 65 for a Temporary Restraining Order and/or Preliminary Injunction ("Hornbeck Declaration"), attached hereto as **Exhibit D**, ¶ 2. She elected to receive her benefits by direct deposit to her Netspend bank account ("Account"). *See* Hornbeck Declaration ¶ 2. On May 20, 2020, she received an email notifying her that her personal and financial information was exposed in the Data Breach. *Id.* ¶ 3.

On May 21, 2020, Hornbeck received her PUA benefits, which were directly deposited in the Account. *Id.* ¶ 4. Later that day, she received an alert from Netspend that her bank card linked to the Account was reported stolen. *Id.* ¶ 5. She knew it was not physically stolen, because she had

it in her possession. *Id.* She immediately attempted to login to her bank account online, but her login credentials would not provide her access to her Account. *Id.* ¶ 6.

Hornbeck called the bank, as she was concerned about the security of her Account. *Id.* ¶ 7. She provided her credentials and correctly answered the security questions, reset her credentials, and ordered a new bank card to be delivered to replace the now canceled card. *Id.* She was without the use of the card until the canceled card would be replaced. *Id.*

The next day, on May 22, 2020, she discovered that, using the updated account information, she was again locked out of her account. *Id.* ¶ 8. In a follow up conversation with a Netspend representative, Netspend informed her that, after ten years of banking with Netspend, Netspend decided to end its banking relationship with her. *Id.* ¶ 9. Netspend informed her that it would send by mail a check for the money in her account that would reach her in 7¬10 business days. *Id.* Until she receives the check, she will not have access to the money in her account, which is her primary account for making purchases, and which includes the much-needed PUA benefits. *Id.*

In addition, Hornbeck received two alerts from her phone company, Boostmobile, that the pin on her account was requested. *Id.* ¶ 10. She had not requested the pin, nor authorized another person to do so. *Id.* She made a phone call to Boostmobile to inquire, and to ensure the account was secure. *Id.* Like Nolen, Hornbeck suffered identity theft as a result of the Data Breach.

## II.     LEGAL BASIS FOR INJUNCTIVE RELIEF.

The grant or denial of a Motion for Preliminary Injunction lies within the sound discretion of the Court. *Adams, et al. v. Federal Express Corp.*, 547 F.2d 319, 322 (6th Cir. 1976). The exercise of the Court's discretion in this area is guided by the following four factors:

1. Whether the movant has shown a strong or substantial likelihood or probability of success on the merits.

2. Whether the movant has shown irreparable injury.

3. Whether the preliminary injunction could harm the Defendant or third parties.

4. Whether the public interest would be served by issuing the preliminary injunction.

*Frisch's Restaurant, Inc. v. Shoney's, Inc.*, 759 F.2d 1261, 1263 (6th Cir. 1985) (citing *Mason County Medical Ass'n v. Knebel,* 563 F.2d 256, 261 (6th Cir. 1977)).

These criteria "do not establish a rigid and comprehensive test for determining the appropriateness of preliminary injunctive relief." *Id.* (quoting *Tate v. Frey,* 735 F.2d 986, 990 (6th Cir. 1984)); *see also Roth v. Bank of the Commonwealth,* 583 F.2d 527, 537 (6th Cir. 1978). "[T]he four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met." *In re DeLorean Motor Co.,* 755 F.2d 1223, 1229 (6th Cir. 1985). The purpose of a preliminary injunction is to preserve the status quo between the parties pending a final determination on the merits of the action. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Grall,* 836 F.Supp. 428, 431 (W.D. Mich. 1993).

The status quo is defined as the last peaceable uncontested status that existed before the dispute arose. *Montgomery v. Carr*, 848 F. Supp. 770, 779 (S.D. Ohio 1993) (citing *Massachusetts Mut. v. Associated Dry Goods*, 786 F.Supp. 1403, 1427 (N.D.Ind.1992)). Given the limited purpose of preserving the status quo, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.,* 511 F.3d 535, 542 (6th Cir. 2007) (quoting *Univ. of Texas v. Camenisch,* 451 U.S. 390, 395 (1981)).

This Motion is brought on an emergency basis to preserve the status quo, by requiring Deloitte to secure the personal and financial information of Plaintiffs and other Pandemic Unemployment Assistance applicants in Defendant's possession, custody, or control to prevent unauthorized access to it

In the case at hand, all of the elements for injunctive relief are met.

### A.   Substantial Likelihood that Plaintiffs will Prevail on the Merits.

Plaintiffs can demonstrate a likelihood of success on the merits of the underlying action. The Notice (discussed above) includes language which indicates Deloitte recognizes it has at least some liability, as it states that "We apologize for any concerns or inconvenience as a result of this unauthorized incident. Please be assured that we take very seriously our responsibility to safeguard the personal information you entrust to our care, and deeply regret that this incident occurred." *See* Notice, pp. 1-2.

While Plaintiffs have alleged three separate theories for recovery in this lawsuit, (1) Negligence; (2) Invasion of Privacy; and (3) Injunctive Relief, all of these theories stem from the same facts—that Defendant's actions and inactions resulted in the Data Breach. While it is possible that Plaintiffs may not prevail under every theory of liability at trial, given that Defendant admits that Plaintiffs' and Class members' personal and financial information was unsecured and apologized, it is highly likely that Plaintiffs will prevail on at least some of the theories which they have pled. That is all that is necessary to weigh in favor of granting a temporary restraining order and/or preliminary injunction.

### B.   Irreparable Harm Will Occur If a TRO/Preliminary Injunction is Not Granted.

"A plaintiff's harm from the denial of a preliminary injunction is

13

> irreparable if it is not fully compensable by monetary damages." *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012). "However, an injury is not fully compensable by money damages if the nature of the plaintiff's loss would make the damages difficult to calculate." *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007).

*D.P. Dough Franchising, LLC v. Southworth*, No. 2:15-CV-2635, 2017 WL 4315013, at *15 (S.D. Ohio Sept. 26, 2017).

By Defendant's own admission, Plaintiffs and Class members have already suffered the disclosure of their personal and financial information as a result of the Data Breach. Defendant's ongoing and continuing wrongful conduct, including its failures to employ reasonably adequate security over Plaintiffs' and Class members' personal and financial information and failures to adequately remedy the effects of the Data Breach, has caused and will continue to cause Plaintiffs and Class members to suffer irreparable harm, including but not limited to: fraudulent charges, fraudulent activity relating to opening new accounts for credit, loss of use of and access to their account funds and costs associated with inability to obtain money from their accounts, damage to their credit, out-of-pocket expenses, the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses. Compl. ¶ 110. Plaintiffs and other PUA applicants are among the most needy during this difficult economic time and they will be irreparably harmed without a TRO/preliminary injunction because the unauthorized access to their personal and financial information is interfering with their access to funds for basic necessities, such as food, rent, etc. *See, e.g.,* Sections I.C.1 and I.C.2, *supra*.

Moreover, to the extent that Defendant stores on unsecure and unencrypted systems additional personal and financial information of Plaintiffs and Class members that has not already

been compromised, further irreparable harm to Plaintiffs and Class members is imminent until such time as Defendant adequately secures the personal and financial information of Plaintiffs and other PUA applicants in Defendant's possession, custody, or control to prevent unauthorized access to it. Plaintiffs and Class members are subject to irreparable injury in the form of identity theft and misuse of their personal and financial information by unauthorized persons. As demonstrated by Nolen, this unauthorized access continues to date.

### C. No Undue Hardship is Imposed on Defendant or Others.

It cannot reasonably be argued that an undue hardship will be imposed on Defendant or others by the granting of a TRO/preliminary injunction. The sole impact of a TRO/preliminary injunction will be to prevent irreparable harm to Plaintiffs and Class members by the exposure of their personal and financial information. Plaintiffs seek only to have Deloitte secure this personal and financial information to prevent unauthorized access to it. The requested injunction would do nothing more than preserve the status quo as it existed prior to the Data Breach—*i.e.*, the last, peaceable, uncontested status which preceded the pending controversy—and would not in any way increase the potential liability for Defendant, which weighs in favor of granting the TRO/Preliminary Injunction.

### D. The Public Interest Will be Served by Issuing a TRO/Preliminary Injunction.

The public interest is served by the issuance of a TRO/preliminary injunction. The public has an interest in protecting citizens' rights to privacy and preventing the disclosure of citizens' non-public, personal and financial information to unauthorized parties, which can lead to identity theft. Further, it is in the public interest that Plaintiffs and other PUA applicants who are suffering during this pandemic have their personal and financial information secure to prevent interference

15

with their access to funds for their basic necessities.

### III.  THE COURT, IN ITS DISCRETION, MAY DISPOSE OF THE BOND REQUIREMENT BEFORE ENTERING A TRO/PRELIMINARY INJUNCTION.

While Federal Rule of Civil Procedure 65(c) appears to require the fixing of a bond in order to effectuate a preliminary injunction, the setting of the amount of an injunctive bond is within the discretion of the court and this includes the discretion to require no bond at all. *Preterm-Cleveland v. Himes*, 294 F. Supp. 3d 746, 757–58 (S.D. Ohio 2018), *aff'd*, 940 F.3d 318 (6th Cir. 2019), *reh'g en banc granted, opinion vacated*, 944 F.3d 630 (6th Cir. 2019) (citing *Roth v. Bank of the Commonwealth*, 583 F.2d 527, 539 (6th Cir. 1978); *see also Bunn Enters. v. Ohio Operating Eng'rs. Fringe Benefit Programs*, No. 2:13–cv–357, 2013 WL 3147956, at *15, 2013 U.S. Dist. LEXIS 86211, at * 46 (S.D. Ohio, June 19, 2013) ("The amount of security required and whether a bond is needed is up to the discretion of the district court.").

In this instance, there is a good cause for this Court to exercise its discretion and issue the TRO/preliminary injunction in the absence of a bond. By filing this Motion, Plaintiffs are asking the Court for exceedingly modest relief: an Order obligating Deloitte to do what it was originally supposed to do, that is to secure the personal and financial information of Plaintiffs and other PUA applicants. Additionally, a bond would serve no purpose in this case because granting a preliminary injunction would not cause Deloitte to sustain any damages by requiring it to secure the personal and financial information of Plaintiffs and PUA applicants, as Deloitte already has a duty to protect such information.

### IV.  CONCLUSION.

In considering the four factors Plaintiffs must demonstrate in order to be entitled to the temporary restraining order and/or preliminary injunction, the Court must "balance the equitable

16

factors, and none is a prerequisite." *United States v. Edward Rose & Sons*, 384 F.3d 258, 264 (6th Cir.2004). Therefore, in light of the foregoing, Plaintiffs have demonstrated good cause for the court to issue a TRO/preliminary injunction.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs request that the court enter a TRO/preliminary injunction against Defendant, as follows:

- A. Mandatorily enjoin Defendant to secure the personal and financial information of Plaintiffs and other Pandemic Unemployment Assistance applicants in Defendant's possession, custody, or control, to prevent unauthorized access to it;

- B. Award Plaintiffs their costs, and attorney fees; and

- C. Grant any other relief as is deemed just and proper.

(*See* draft Temporary Restraining Order, attached hereto as **Exhibit E**).

Respectfully submitted,

/s/ Marc Dann
Marc E. Dann (0039425)
Brian D. Flick (0081605)
**DANNLAW**
P.O. Box 6031040
Cleveland, Ohio 44103
(216) 373-0539 telephone
*notices@dannlaw.com*

Thomas A. Zimmerman, Jr. (*pro hac vice* anticipated)
*tom@attorneyzim.com*
**ZIMMERMAN LAW OFFICES, P.C.**
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602
(312) 440-0020 telephone
*firm@attorneyzim.com*
*www.attorneyzim.com*

*Counsel for Plaintiffs and the putative Class*

## CERTIFICATE OF SERVICE

      I hereby certify that a copy of the foregoing *Emergency Motion Pursuant to Fed. R. Civ. P. 65 for a Temporary Restraining Order and/or Preliminary Injunction, Exhibits A-D, and Exhibit E - Proposed Entry* was electronically filed on June 1, 2020 and served upon the following parties via electronic mail at the address listed below:

Daniel Warren, Esq. at dwarren@bakerlaw.com
Baker & Hostettler LLP
127 Public Square, Suite 200
Cleveland, OH 44114
*Counsel for Defendant Deloitte Consulting LLP*

                /s/ Marc Dann
                Marc E. Dann (0039425)
                Brian D. Flick (0081605)
                **DANNLAW**
                *Counsel for Plaintiffs and the putative Class*